The opinion of the Court was delivered by
Withers, J.
It is necessary, however laborious, that the case should be stated, upon which our judgment is to be pronounced.
On the 8th April, 1843, Hammond, dealing with Thomas J. Gantt as a member of the firm of Gantt & Mortimer, brokers purchased fifteen negroes, the property of Henry Seabrook, the plaintiff’s testator. Gantt delivered to Hammand, on that day, the bill of sale of Plenry Seabrook, with a receipt on the same *162 by Gantt & Mortimer, in these words, to wit: “ Received of J. H. Hammond three thousand three hundred and twenty-five dollars, the amount of the purchase money for the within named slaves. (Signed) Gantt & Mortimer,” and dated 8th April, 1843. On the margin of the bill of sale, and under the same date, appears the following stipulation: “ I hereby pledge myself to appropriate the proceeds of the sale of the above negroes to the payment of all the liens on them. (Signed) Thomas. J. Gantt.” The face of the bill of sale makes Seabrook say that he had received the above amount from Hammond at and before the sealing and delivery of the same. The fact was, however, that when the negroes were delivered to Hammond, the latter delivered to Gantt a check on the Bank of Charleston for $3100, in favor of Gantt & Mortimer, payable on the 21st April, 1843, and paid in cash to Gantt $225, being the remainder of the purchase money. This check Mortimer deposited in the Bank of Charleston for collection, and not being paid at maturity it was protested. On the 19 th of April Hammond had provided funds to pay it, in the Bank of the State of South Carolina, and had deposited in the post office at Columbia a letter to the cashier enclosing a check on those funds, in favor of Gantt. Before the letter was despatched Hammond received notice from Northrop that judgments to the amount of $2168 29 had been obtained by him against Henry Seabrook, in Walterboro’. on the 7th April, 1843, the day before the purchase of the negroes ; whereupon Hammond withdrew his letter to the cashier from the office, and cut off the check in favor of Gantt, and so informed him by another letter of same date, stating the reason. He added, addressing Gantt, “ Do arrange the matter with Northrop. As soon as I find 1 am safe in so doing I will send the check for $3100 as before. I hope you have not discounted my check in the Bank of Charleston. You have no interest in this matter to see me injured, and trust you will not permit it. I have your obligation to appropriate this money to pay the liens on the negroes.” In the letter of the same day by which he had advised Gantt that he had enclosed a check to meet that drawn on the Bank of *163 Charleston, Hammond uses this language: “ I have forwarded, by this mail, a draft on the Bank of the State for the amount of your check, and enclosed them also a check for you, in lieu of the one I gave you. Please call on Mr. Furman and substitute checks, and get your money. I think this arrangement will suit you just as well.” Gantt answered under date of the next day, (20th,) and says : “Had Mr. Northrop called on me the necessity of writing to you would have been obviated. I told you that I would apply the money to the removal of the liens on the ne-groes ; and told Mr. Brown, (our sheriff here,) to whom the executions were sent, that I would pay them: the amount being sufficient for all the judgments against Mr. Seabrook, at whose direction I was thus to apply the proceeds“ I can only remove the incumbrances with the money. If you send it to me they shall be removed.” He proceeded to urge him to send the money or to go down and attend to the matter himself. By a letter post marked 23d April, Hammond remitted a check to Gantt for the money, and said, “ I thought you said there was a judgment against Seabrook for about $1500, and did not suppose you knew of the judgments obtained only the day before our trade for $2168. I considered them as an addition to the $1500. I rely on your understanding the matter and protecting me from loss. Send me the check I gave you on the Bank of Charleston.” By another letter of the 23d April, 1843, Hammond advised Gantt he was led to conjecture that Seabrook was well nigh insolvent, that his property was heavily mortgaged, and other judgments existed besides those obtained by Northrop.— He added: “ I write to suggest to you the propriety of paying off the oldest judgments and taking assignments of them either for yourself or me. As you stand between me and him,” (meaning Seabrook,) “ you will perhaps do well to take care of yourself. I would release you of responsibility for an assignment made to me to the amount of the purchase money of these negroes. I make the suggestion. You know your -own business. A word to the wise,” &c.
Between this date, 23d April and June 10th, we find no fur *164 ther correspondence between Hammond and Gantt. On the latter day Gantt wrote to Hammond, saying: “ All but one difficulty has been gotten over with regard to the Seabrook negroes; and that I.wish you to determine, and let me know immediately the result.” He alluded to an unsatisfied judgment for $5000 against Seabrook in favor of Gibbs, found in the clerk’s office in Charleston, obtained in 1827, and suggested reasons for supposing it might in fact be satisfied. On the 16th June Hammond responded from Silver Bluff, saying it was impossible for him to determine whether Gibbs’s judgment was satisfied or not. He added, “ I trust you will not pay over the money until you know all about it.” “ I have only to say again that I trust you will not part with the money in any way but such as to render me secure. You hold the stakes, and must see justice done.”
The next communication was a letter from Henry Seabrsok to Hammond, under date June 18th. He says, that he has learned from Gantt & Mortimer the purchase of his negroes by Hammond from them, and that he had refused payment until all objections to the titles were cleared. In this he thought him right, acknowledged his legal liability to that effect, and informs Hammond that he, and Wilson as his attorney, had satisfied titles to Gantt & Mortimer three weeks before that date, (18th June,) and obtained an acknowledgement of it: that they represented they had written to Hammond several times to that effect, and could get no answer: that he was ignorant where Hammond had placed funds to pay for the negroes, could not account for the non-payment, nor could he believe that Hammond had been wilfully in default.
To this Hammond answered, at large, on the 29th June, and gave Seabrook a narrative of the whole transaction, as it has appeared in the foregoing abstract. He informs Seabrook that Gantt had fixed the liens on the negroes at $1500 at the time of the purchase: that intelligence from Northrop had so accumulated the amount as to alarm him, and induce him to withhold the money until April 22d, when he had remitted the whole of the balance: that he had supposed the money had been paid *165 over to him, until Gantt by letter of 10th June, had referred to the judgment in favor of Gibbs, and he (Hammond) had declined to decide anything about that matter, — and declined also to “ authorize” Gantt to pay over the money until he, Gantt, was satisfied, — that Messrs. Gantt & Mortimer had in some sort indemnified him, and he hád resigned the whole matter to them: that he supposed they only desired to render themselves safe.
So the matter rested until the 19th September, when Mortimer addressed Hammond, informing him that the firm of Gantt & Mortimer had been dissolved on the 31st August preceding, and he requested payment for Seabrook’s negroes: that the judgment in favor of Gibbs was then satisfied, “ and the other judgments, to meet which the property was sold, will be paid as soon as the purchase money is paid.”
The last letter, in the series before us, is from Gantt to Hammond, in answer to one we have not seen, under date of 14th October, 1843, in which he expresses sentiments of deep contrition for the misapplication of the funds in question to his private use. He used this language: “As to agency, I agree with you fully, that I in no sense was your agent, except so far as my obligation to you went to see that the property was clear before it was paid for, and which I regret now that you required.” In his deposition, as a witness, Gantt says, (speaking of the call by Seabrook and Wilson for the money, and the inquiry by Wilson whether he was Hammond’s agent,) “I told him I was so far his agent, tnat I had promised to see that the judgments were satisfied before I parted with the money.” And again, that “ I would hold the money ’till the judgments were satified.” It has already been seen that his stipulation with Hammond was, not to hold the money ’till liens were satisfied, but to apply it to that end, the amount of liens then being $ 1500 as supposed. The stipulation was this: “ I hereby pledge myself to appropriate the proceeds of the sales of the above negroes to the payment of all the liens on them.” Gantt was giving his recollection of the matter without the letters before him.
Mortimer testified that he had been released by the plaintiff— *166 that he deposited Hammond’s check on the Bank of Charleston for collection, and it was protested. That no money whatever was ever paid to the firm, so far as he knew, by Hammond,— never appeared on the books of the firm : that according to the correspondence between Hammond and Gantt, the latter was Hammond’s agent, instructed not to part with the money in any way but such as to render him secure: that Gantt withheld the money from the firm according to such instructions, — that the whole difficulty arose from Hammond’s not paying the check to Gantt & Mortimer, and afterwards paying the same to Gantt individually, instead of Gantt & Mortimer, whose receipt he took in the first instance, and to whom he was bound to pay the money.
It appeared that Mortimer was the keeper of the books and accounts of the firm, and Gantt was the manager of out door business, of sales, &c.
Such is supposed to be a fair exhibition of the characteristics of this cause, — of those facts which are to determine its legal aspect.
The plaintiff’s right to recover from Plammond has been placed upon the ground, that he placed the money in the hands of Gantt, individually, as a deposit, and that he did not make a payment to Gantt & Mortimer. If this proposition be true, and the money remained in the hands of Gantt, individually, until his failure, as a deposit, and subject to the control of Hammond as such, the right of the plaintiff to recover is established.
We say remained in the hands of Gantt as an individual, and as Hammond’s depositary, until he failed; for it can be conceived that if a privity existed, at the time of the sale, between Sea-brook and Hammond, through the brokers, Gantt & Mortimer, to the effect, that the purchase money should be received by them, and applied to the extinguishment of liens on the negroes purchased, it would be an element in the contract of purchase; and, if Hammond complied with his contract, thus qualified, he would become absolved from liability to Seabrook. Portions of the testimony might be referred to, calculated to raise such an *167 enquiry; law could be cited to show that Gantt & Mortimer were factors,, and not brokers, (as they were in the English sense) and being .general agents of that species, might make stipulations, binding on the principal, though contrary to his private instructions, and stipulations which a broker, as such merely, might not. Yet the case was not, on the circuit, placed upon such questions, and it would not be satisfactory to make it turn upon them here.
It was submitted to the jury, as turning upon the question, whether Hammond made a deposite with Gantt, as his bailee, in the character of depositary, or made a payment of the purchase money to Gantt & Mortimer.
The common definition of a deposite is this,' — “ A naked bailment of goods, to be kept for the bailor, without recompense, and to be returned when the bailor shall require it.”
Certainly modern times have added to the original idea, money, as the fit subject of deposite; or, else, has made the word, goods, embrace it. And although the notion, as to a naked deposite of goods, was, that the thing deposited was to be returned in individuo, and it is said in Bell’s Commentaries, and repeated by Justice Story, that if the right to let money, or to use it, followed from the bailment, it would cease to be a de-posite, and fall under some other denomination, yet it might be thought our modern notion of deposits in Banks over-rides such a doctrine, in its full extent, as necessarily a characteristic of a deposite. Banks do perpetually use the money, and it is so understood by both parties in the inception, as a compensation for their services as depositaries, and, of course, they are not held to return the identical money. Yet when (as in this case) the stipulation was, that Gantt was to appropriate the sum to the extinguishment of liens upon Seabrook’s property; when it was known to purchaser, seller and brokers, or factors, that the money was the proceeds of Seabrook’s property; when the fact appears (and Gantt does say) that Seabrook so authorized his agent to apply it; when Seabrook admits (as he does in his letter to Hammond) that he was bound to extinguish those *168 liens before he could demand the money; when it is considered that this, in itself, was most proper as to the rights and duties of all parties who participated in the transaction — it is difficult to conceive how Hammond could have recovered from Gantt, or Gantt & Mortimer, the money as a deposite, or how Gantt, or Gantt & Mortimer, could have withholden it from Seabrook, when that duty was performed. Now that duty was incumbent on Seabrook; he admitted it; the money was in Gantt’s hands about a fortnight after the purcháse of the negroes, to wit, on the 24th or 25th of April, as may reasonably be inferred; and yet as late as the 18th June, (almost two months after the money had been placed in Gantt’s hands) Seabrook informs Hammond that he did not know in whose hands his funds had been placed, “to meet payment on satisfaction of titles,” although three weeks befoie that time, he (Seabrook) with his attorney, John. L. Wilson, “ had satisfied titles to Messrs. Gantt & Mortimer, and obtained an acknowledgment of it.” What does this shew? Why this much certainly; that he considered himself bound to “satisfy titles to Gantt & Mortimer;” (and Gantt says, by Seabrook’s direction, the purchase money was thus to be applied) ; that early in May he had performed that duty; that he had been attended on that occasion by an attorney; that he had not ascertained that the money was then in the hands of the very member of the firm of agents with whom he was dealing, though the fact was, that the money was in that person’s hands completely emancipated from all possible restriction, if the fact be, as Seabrook affirmed, that he had satisfied titles to Gantt & Mortimer, and procured their acknowledgment of the same. It is scarcely credible that Mortimer did not know that Gantt had the money. He knew the first check had been withdrawn, and he had, himself, placed that in the Bank of Charleston for collection. He admits that Gantt had exhibited to him letters from Hammond, showing that he had placed the money in Gantt’s hands, but he chooses to add, with a controlling instruction, — nor does he fix the time when he ascertained ihis fact. He could, at any rate, have stimulated the enquiries of Seabrook.
*169 If, then, we give the most unfavorable interpretation to Gantt’s stipulation with Hammond, to wit, that it was a special deposite with Gantt, individually, clogged with a legal restraint, instead of a trust in Gantt’s undertaking as to the application of it, — it must, nevertheless, be conceded, that from a period, sometime in May, no obstacle, proceeding from Hammond or created by him, interposed between Seabrook and the money. If, in May, instead of the 18th June, Seabrook had addressed Hammond, he would have ascertained (it is presumed) that the money was accessible to him. If his agents were to sell for cash, with no stipulation in favor of the buyer touching the extinguishment of liens by the specific application of the purchase money to that purpose, it is hard to account for the lethargy he exhibited in pursuing the money.
This course of observation, which it is not intended to expand, will shew, that there was a want of diligence, on the part of Seabrook, first, in extinguishing liens, which was his duty, (and he so admits) — second, in obtaining knowledge of the fact, that the money had long been in the hands of a member of that firm with whom he dealt as his agents. It is calculated to afford the satisfaction of knowing, that if we are led to visit the loss upon the principal, it is not without the support of that sense of right, springing from a conviction, that a greater diligence on his part, in supervising those whom he trusted and in exacting from them the real truth, as well as a livelier performance of his own clear duty, in lifting liens on his property sold, would have saved him from the disaster.
Hammond has been treated, by the counsel for appellants, as a mere depositor of money with Gantt, having an entire control over it, and retaining that control till Gantt & Mortimer failed. After considering the evidence, and what has been said thus far, can it be seriously believed, that the power of Hammond over the money which existed while he had it in Bank, accompanied it when he transferred the same to Gantt? He surely paid it to him for the use of another, who was entitled to the use of it. And though he had Gantt’s pledge to appropriate it in a certain *170 way, it is quile clear, from the whole case, that such appropriation was conformable to the duty and directions of Seabrook also, and that both Gantt and Seabrook had such an interest in the execution of the pledge as must have disabled Hammond to recall the money, whatever other legal right Hammond may have asserted against Gantt upon default.
The true interpretation of the transaction we take to be this :— Hammond took a bill of sale from Seabrook, through his agents, for negroes, and a receipt from them, as for an actual payment of money, with a pledge by one of them to appropriate it to the extinguishment of certain liens, known to exist upon the property purchased. For some reason, the cash was not, in fact, paid, but a check, at short time, was executed payable to those agents. In the mean time other liens, not originally known, came to Hammond’s knowledge. He hesitated to meet his check, for two or three days, but after that short hesitation did pay it in Cash with no new stipulation, but only with an impressive reference to that already existing. The last check remitted, which produced the cash, was no more than a substitute for the first. On the 19th April, Hammond expressly said to Gantt, “ I have forwarded by this mail a draft on the Bank of the State for the amount of your check, and enclose them also a check for you, in lieu of the one I gave you. Please call on Mr. Furman and substitute checks and get your money.” Although this check was withdrawn for some three days, it was then forwarded and the cash received by Gantt, — with this admonition from Hammond ; “ I rely on your understanding the matter and protecting me from loss.” If the first check, was a transaction with Gantt & Mortimer, the last, which produced the money, was certainly intended to be the same ; it was in lieu of the first; it was sent to the man whom alone Hammond knew from the beginning as representing Gantt & Mortimer as well as Seabrook, and was meant to place money in the hands of Gantt & Mortimer, else Hammond could never have called it “ your money.”
It. appears to us that Hammond’s power over this money was gone thenceforth. We can discover nothing in the subsequent *171 correspondence beyond suggestion and solicitude expressed to Gantt as to removal of liens or other arrangements equivalent thereto; and re-affirmation of his duty to keep his stipulation in that respect by such use of the money. But if Gantt bad paid it over' to Seabrook forthwith, we are at a loss to perceive that Hammond could have asserted any legal claim to it whatever; on the contrary, we suppose he would have been confined to any damages he could establish as flowing to him by breach of Gantt’s promise.
It has been insisted that Hammond’s liability ought to have been affirmed as a matter of law, and that there was error in referring the question of fact to the jury, to wit, whether it was a deposite only, or a payment. If the question had arisen on the bill of sale, and what appears thereon, the law and the fact would have been adverse to the plaintiff, without doubt. Upon the introduction of the correspondence and the depositions of Gantt & Mortimer, doubt enough has been raised to divide this Court upon the question of deposit or payment. It would seem that this would vindicate the propriety of taking the verdict of a jury, and should render it of no little avail to the the defendant, upon consideration of the motion here made.
Very much more discussion might be indulged upon'the testimony, and law might be cited to elucidate the views taken by a majority of this Court. They must, however, be content to add, that they deem the result, on the circuit, to have been conformable to law and evidence; and, therefore, to order that the motion be refused.
Evans, Wardlaw and Whitner, JJ. concurred.